IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LAWRENCE CHRISTOPHER REDDING,

Plaintiff,

3:10-CV-998-PK

v.

FINDINGS AND RECOMMENDATION

J. DHALIWAL, DAVIS, JACQUEZ, and TOVAR,

Defendants.

PAPAK, Magistrate Judge:

Plaintiff Lawrence Christopher Redding, an incarcerated prisoner proceeding *pro se*, filed this action *in forma pauperis* on August 20, 2010. Following significant motion practice, over the course of which Redding amended his pleading twice, the court liberally construed the allegations of Redding's first and second amended pleadings and dismissed certain of Redding's pled and/or construed claims in whole or in part. On May 15, 2012, I recommended that the court dismiss Redding's remaining claims pursuant to Federal Civil Procedure Rule 12(b)(6) for failure to state a claim, other than the following: (i) one claim alleged against defendants Dhaliwal and Davis arising out of those defendants' alleged violation of Redding's rights under the Eighth Amendment to the United States Constitution, premised on those defendants' alleged

role in causing undue delay in scheduling medically necessary surgery to Redding's back, and (ii) one claim alleged against defendants Dhaliwal, Tovar, and Jacquez, arising out of those defendants' alleged violation of Redding's rights under the First Amendment, premised on Dhaliwal's decision to reduce Redding's prescription for narcotic pain medication, allegedly in retaliation for certain of Redding's filed grievances, on Tovar's conduct in placing Redding in a Special Housing Unit, allegedly in retaliation for a grievance Redding filed regarding the confiscation of his wheelchair, on Jacquez' failure to process one of Redding's grievances, allegedly in retaliation for Redding's exercise of his right to file grievances, and on Jacquez' role in placing Redding in a two-man cell with two other men for a period of approximately six months, allegedly in retaliation for Redding's exercise of his right to file grievances. On June 25, 2012, Judge Hernandez adopted my recommendation in part, dismissing all of Redding's claims other than those described above, but in addition dismissing Redding's First Amendment retaliation claim to the extent premised on Jacquez' role in placing Redding in a two-man cell with two other men for a period of approximately six months.

Now before the court is the remaining defendants' motion (#220) for summary judgment as to each of Redding's remaining claims. I have considered the motion and all of the pleadings and papers on file. For the following reasons, the motion should be granted, summary judgment should issue in defendants' favor on each of Redding's remaining claims, and a final judgment should be prepared.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND[1]

In or around January 2007, Redding injured his back when he slipped and fell on a sheet of ice while incarcerated at the Terre Haute Federal Correctional Institution. At or around that

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

time, he was advised by two different neurologists that he would need back surgery to repair the injury he had suffered. Following the accident, he was provided with narcotic pain medication, including Percocet. Redding did not ultimately undergo surgery to repair his back injury until July 2012, some time after this litigation was initiated.

In February 2009, Redding was assaulted by fellow inmates at Terre Haute, suffering injuries that exacerbated the pain symptoms caused by his back injury. Shortly thereafter, Redding was prescribed a more powerful pain medication, Oxycodone, apparently both because his pain symptoms were more acute and because the Percocet had begun to aggravate Redding's pre-existing Hepatitis C symptoms. Redding was apparently advised by the prescribing Terre Haute physician that he would continue to take Oxycodone until after he underwent back surgery.

In July 2009, apparently out of concern for Redding's safety were he to remain housed at the institution in Terre Haute, Redding was transferred to the Sheridan Federal Correctional Institution. At Sheridan, Redding explained to a physician's assistant (not a party to this action) that he needed back surgery, that he was still experiencing pain symptoms, and that Oxycodone controlled his pain symptoms, but that he was beginning to habituate to the prescribed dosage. The physician's assistant advised Redding that he was unable to prescribe a higher dosage, and that Redding would need to consult with a physician if he wanted to change his medication. Redding attempted to see a physician on August 27, 2009, but was seen by physician's assistant Cieslik, a former defendant in this action, instead. She advised him that she, also, was unable to prescribe medication.

On September 2, 2009, Redding filed an informal BP-8 grievance requesting that his pain medications be increased. The request was denied. On September 19, 2009, Redding filed a

formal BP-9 grievance regarding the same issue. On October 13, 2009, the administration requested additional time to respond to the grievance. Two days later, on October 15, 2009, defendant Dhaliwal, a prison physician, reduced Redding's pain medications in an effort to taper him off narcotic pain medications altogether. Although Redding takes the position that Dhaliwal did so for the purpose of chilling Redding's First Amendment right to file grievances, defendants offer evidence that a civilian neurosurgeon, former defendant Buza, had opined that Redding would be a better candidate for back surgery if he were not using narcotic medications. Partially on the basis of that evidence, defendants take the position that Dhaliwal's actions were calculated to improve Redding's chances of being approved for surgery. In addition, defendants offer Dhaliwal's sworn testimony that, at the time he took the complained-of action, he was unaware of Redding's grievances, and that all decisions he made relating to Redding's medical care and pain management regimen were based on his clinical judgment as to how best to meet Redding's medical needs.

On October 23, 2009, prison medical staff confiscated the wheelchair Redding had been using for transportation over "long distances." Redding filed an informal BP-8 grievance regarding the incident on November 8, 2009. Apparently following denial of the informal grievance, Redding filed a formal BP-9 grievance regarding the same incident on an unspecified date. On December 10, 2009, the administration requested additional time to respond to the grievance. Apparently following denial of the formal grievance, Redding filed a BP-10 administrative appeal with the Western Regional Office of the Bureau of Prisons regarding the same incident. Having received no response to his appeal, on July 10, 2011, Redding filed a BP-11 administrative appeal which was returned to him without processing. On September 6, 2010,

Redding filed an additional informal BP-8 grievance regarding the incident.

In August 2010, Redding was placed in a Special Housing Unit for disciplinary purposes. It is Redding's position that defendant Tovar ordered Redding's placement in the SHU, and that she did so for the purpose of chilling Redding's exercise of his First Amendment right to file grievances. However, defendants offer Tovar's sworn testimony that at the time Redding was placed in the SHU she had no knowledge of Redding's filed grievances, and that at all material times she lacked authority personally to order an inmate's detention in the SHU. In addition, defendants offer into evidence an Administrative Detention Order dated August 27, 2010, indicating that the order to place Redding in the SHU was issued by Lieutenant R. Reed, pending investigation of Redding's alleged violation of Bureau regulations (specifically, "[l]ying to a staff member" and "[f]ailure to follow programs," each apparently in connection with Redding's purported noncompliance with medical directives calculated to wean Redding off reliance on the wheelchair).

On January 28, 2010, Dhaliwal ordered that Redding be fed a diet without tomato or citrus products. The mess hall at Sheridan refused to comply with Dhaliwal's order. On February 8, 2010, Redding filed an informal BP-8 grievance regarding the failure to provide him the special diet ordered by Dhaliwal. That same day, Sheridan Case Counselor Clifford Simmons responded to the grievance, advising Redding that standard procedures for requesting a special diet required the Clinical Director's approval of the diet, which would then be forwarded to defendant Jacquez, the Associate Warden for Programs, for authorization. Defendants offer Simmons' sworn declaration that he did not consult with Jacquez regarding Redding's informal grievance of February 8, 2010, as well as Jacquez' sworn declaration that he was unaware of the

grievance, was never at any material time aware of the special diet request, and that he took no action to chill Redding's First Amendment rights. Redding takes the contrary position that Jacquez refused to act on the grievance for the purpose of chilling Redding's exercise of his First Amendment right to file grievances.

On March 30, 2010, Redding was examined by civilian neurosurgeon and former defendant Buza. Buza contemporaneously recorded his recommendations for Redding as follows:

> I will order a CT scan of the lesions identified [at T11 and T10] on his MRI scans. However, he does have spondylosis of the lower lumbar spine. We have discussed surgical intervention vs. conservative measures and I have also indicated that his condition is not life-threatening and surgery is not mandatory. We will reassess him after the scan is completed.

Redding filed this action on August 20, 2010. That same day, Redding was examined by Sheridan physician and former defendant Westermeyer in a "visit solely directed to his spinal problem." Westermeyer noted that Redding had "been seen by Dr. Buza, the third neurosurgeon that he has seen (because of transfer to [Sheridan from Terre Haute] and delay due to a burn) that is recommending surgery." Westermeyer opined that Redding suffered from a "[v]ery symptomatic problem of lumbar spinal stenosis with bilateral radicular symptoms." Westermeyer noted that he discussed Redding's symptoms with Buza, "who corroborates the above" and who was "planning surgery when [Sheridan Health Services] can schedule [it]." Westermeyer noted that Buza "relate[d] his strong preference that [Redding] be narcotic free when he comes to surgery," which was also Westermeyer's preference "as [Redding's] potential for an excellent outcome goes up dramatically if he remains narcotic free until that time."

On December 1, 2010, Westermeyer examined Redding again. At that time,

Westermeyer characterized Redding as "awaiting lumbar spinal surgery," which he noted "ha[d] been delayed to see if [Redding] can lose more weight prior to surgery." Westermeyer noted that Redding had "been trying very hard" to lose weight and had in fact lost twenty pounds, but that further weight loss was proving difficult due to his back problems preventing him from further increased activity. Westermeyer concluded that Redding "ha[d] severe lumbar stenosis and . . . T8-9 moderate stenosis." Moreover, Westermeyer opined that Redding's lumbar stenosis was "becoming more symptomatic," and that "[i]t is now time to fix this surgically":

> He is a large man, but obesity is not the major issue at this time. Not reasonable to expect more weight loss, he has done absolutely everything he can to be compliant. Needs surgery so he can be more active and physically fit. Will not happen until this is surgically repaired. Further delay with worsening symptoms will lead to increased morbidity, rather then [*sic*] to less.

On December 21, 2010, Sheridan's "Utilization Review Committee" approved spinal surgery to correct Redding's lumbar spinal stenosis. In January and February 2011, Sheridan medical staff attempted to schedule the approved surgery with a civilian neurosurgeon.[2] On January 21, 2011, summons issued against Buza in this action, and in February 2011 Buza declined to perform the lumbar spinal surgery he had recommended; defendants take the position that he declined to perform the surgery specifically because he learned he had been named as a defendant in Redding's lawsuit.[3]

---

[2] It is undisputed that Sheridan Health Services lacked medical personnel qualified to perform the surgery Redding required.

[3] The only evidence of record I have identified that lends any support to defendants' position, other than the closeness in time of the two events, is a March 23, 2011, response of the National Inmate Appeals board to Redding's appeal of the denial of one of his grievances regarding the adequacy of his medical care, in which the board advised Redding that:

> Relevant portions of your medical record have been reviewed which reveal you

Following Buza's refusal to perform the surgery, Redding's situation was brought to the attention of James Pelton, the Western Regional Medical Director for the Bureau of Prisons. Pelton instructed Sheridan medical staff to continue its efforts to locate a civilian neurosurgeon willing to perform the surgery while Pelton in parallel initiated the frequently slow process of transferring Redding to an alternative institution with staff qualified to perform lumbar spine surgery.

In March 2011, Sheridan attempted to schedule surgery with an alternate civilian neurosurgeon, Joseph Sherrill. On March 19, 2011, Sherrill declined to perform the surgery, on the grounds that he did not diagnose Redding's symptoms as caused by "critical spinal canal stenosis" at the lumbar level.

In January 2012, space became available for Redding at a Bureau of Prisons medical center, specifically the U.S. Medical Center for Federal Prisoners (MCFP) in Springfield, Missouri. Redding was transferred to that facility, where he was evaluated for surgery. On June 11, 2012, Redding underwent a thoracic decompression discectomy, as the lesions at the thoracic level of his spine were deemed more pressing than the stenosis at the lumbar level. Redding continues to receive health care in connection with his back issues at the Springfield facility.

## ANALYSIS

As noted above, Redding alleges defendants Dhaliwal's and Davis' liability for the violation of his rights under the Eighth Amendment, and defendants Dhaliwal's, Tovar's, and

---

> been [*sic*] diagnosed with lumbar stenosis and was [*sic*] scheduled to undergo surgery. The surgery has been delayed as you initiated legal action against FCI Sheridan, and the consultant neurosurgeon that was to perform the surgery declined to do so..

Jacquez' violation of his rights under the First Amendment. Although there is no express statutory cause of action available to private citizens subjected to so-called "constitutional torts" by federal employees or others acting under the color of federal law, in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the United States Supreme Court recognized an implied cause of action for money damages under the Fourth Amendment for an injury caused by a federal agent acting under color of federal authority. *See Bivens*, 403 U.S. at 389. Since *Bivens*, the federal courts have recognized similar implied causes of action in connection with a broad range of constitutional torts, including the violation of an incarcerated prisoner's rights under the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14, 20 (1980), and the violation of rights under the First Amendment, *see Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986). In a *Bivens*-style action against a person acting under color of federal authority, a defendant may only be found liable to the extent that his or her conduct actually caused (or contributed to the causation of) the plaintiff's complained-of deprivation; there is no supervisory liability in a *Bivens*-style action. *See, e.g., Ky. v. Graham*, 473 U.S. 159, 166 (1985), *citing Monroe v. Pape*, 365 U.S. 167 (1961); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Defendants move for summary adjudication as to both of Redding's claims.

## I. Redding's Eighth Amendment Claim

Redding's claim premised on the violation of his rights under the Eighth Amendment arises out of the purported respective failures of Dhaliwal and of Davis to provide Redding with necessary medical care, specifically the failure of each of those defendants to arrange in timely fashion for necessary lumbar spinal surgery on Redding's back. The Supreme Court has established that a public official's "deliberate indifference to a prisoner's serious illness or injury"

violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To prevail on an Eighth Amendment deliberate indifference claim, a prisoner must establish both (i) that he suffered an objectively serious illness or injury while incarcerated and (ii) that prison officials were subjectively aware of the seriousness of the condition and deliberately denied or delayed access to medical care that could reasonably have been provided. *See Clement v. Gomez*, 298 F.3d 898, 904-905 (9th Cir. 2002). The objective component is satisfied "whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 904 (internal quotation marks omitted), *citing McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *quoting Estelle*, 429 U.S. at 104)).. Under *Estelle*, to establish a defendant's subjective deliberate indifference requires a showing "of something more than mere negligence." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

Defendants offer a significant body of evidence tending to establish both that neither Dahliwal nor Davis was personally involved in causing any delay in scheduling Redding's surgery and that no defendant deliberately caused any undue delay in providing Redding with necessary medical care. First, it is undisputed that neither of these defendants, nor any other person employed at Sheridan, was qualified to perform the surgical procedure at issue. It is further undisputed that, in consequence, Sheridan relies on the services of civilian surgeons to perform such procedures.

Second, it is undisputed that, within three months of his transfer to Sheridan, Redding was being seen by defendant Dhaliwal in connection with his back pain symptoms. Defendants offer Dhaliwal's testimony that, rather than harboring deliberate indifference to Redding's

medical condition, Dhaliwal provided Redding with medical care that, in his professional judgment, was calculated to improve Redding's condition and lessen the discomfort he was experiencing. Dhaliwal further testifies that he took no action either to deny or to delay Redding's access to medical care that could reasonably have been provided to him, and that he had no involvement in Sheridan's efforts to identify a civilian neurosurgeon willing to operate on Redding. Dhaliwal characterizes Sheridan's efforts in that regard as "diligent[]."

Third, it is undisputed that, within five months thereafter, Redding was seen by civilian neurosurgeon Buza, who opined that lumbar spine stenosis surgery was "not mandatory" in Redding's case and that more "conservative" measures than surgical intervention could be sufficient to improve Redding's condition, but nevertheless recommended that Redding take steps calculated to make him a better candidate for surgery, including weight loss, strengthening exercise, and elimination of narcotic pain medications. It is undisputed that Redding continued to receive medical care at Sheridan over the succeeding months, and that within five months after Redding's first consultation with Buza, former defendant Westermeyer opined that Redding had become a good candidate for surgical intervention. Within three weeks of Westermeyer's recommendation that Redding be approved for lumbar surgery, Sheridan accepted that recommendation and began efforts to schedule the procedure with Buza.

Fourth, it is undisputed that Redding attempted to issue summons against Buza in this action in February 2011, less than two months after Sheridan approved Redding's surgery, and that Buza thereafter declined to perform the surgery. I note in this connection that, had Buza been a federal employee, the fact that Redding had brought an action against him would not constitute reasonable grounds for denying Redding necessary medical care, and that had Buza

been a federal employee at the time he declined the surgery, his refusal to perform the surgery would likely constitute an actionable deprivation of Redding's rights under the Eighth Amendment to the extent (if any) that it was motivated by Redding's decision to name Buza as a defendant rather than by Buza's medical judgment. However, I further note that the evidence of record establishes that in Buza's medical judgment, Redding's requested surgery was "not mandatory" and his symptoms could reasonably be treated by more conservative measures. In the absence of any affirmative evidence that Buza believed that immediate surgery was necessary to prevent the unnecessary or wanton infliction of pain, therefore, no grounds exist to support the conclusion that Buza harbored actionable deliberate indifference to Redding's medical needs. Moreover, it is clear both that Sheridan medical staff lacked authority to compel Buza to perform the surgery, and that even if there were evidence that Buza harbored an improper motivation, neither Dhaliwal's nor Davis' liability could be premised on Buza's conduct. In consequence, Buza's refusal to perform the requested surgery is material chiefly to establish that defendants' failure to schedule the surgery in the time period immediately following the procedure's approval was not caused by any defendant's deliberate indifference.[4]

Fifth, it is undisputed that within a month following Buza's refusal to perform the surgery, Sheridan medical staff identified an alternative civilian neurosurgeon qualified to perform the

---

[4] Redding suggests that one or more of the defendants may have advised Buza of Redding's claims against him with the intent to cause Buza to refuse to perform the requested procedure, thereby occasioning delay in Redding's medical treatment. Such conduct. if established, could constitute an actionable deprivation of Redding's Eighth Amendment rights. However, defendants offer affirmative evidence that neither Dhaliwal nor Davis took any such action or attempted to delay the procedure, and Redding offers no evidence in support of his suggestion. Redding's suggestion is therefore insufficient to create a material question of fact for purposes of defendants' motion.

procedure, specifically Sherrill, and made efforts to schedule the procedure with him. As noted above, Sherrill declined to perform the surgery on the grounds that he did not believe that the surgery was necessary or calculated to be helpful, in that he did not believe that Redding's symptoms were caused by "critical spinal canal stenosis" at the lumbar level.

Sixth, it is undisputed that Sheridan medical staff continued to make efforts, albeit unsuccessfully, to locate a civilian neurosurgeon qualified and willing to perform spinal surgery on Redding following Sherrill's refusal to do so. Seventh, defendants offer Davis' testimony that he believes Redding "received extensive and appropriate medical care" during his incarceration at Sheridan.

Eighth and finally, it is undisputed that as a result of the efforts of Sheridan medical staff, in January 2012 Redding was transferred to the Springfield MCFP where personnel qualified to perform spine surgery were available. It is further undisputed that the surgical staff at the Springfield facility declined to perform the lumbar spine surgery for which Redding was approved at Sheridan on the grounds that the lesions at the thoracic level presented a more pressing medical issue. Approximately six months after his transfer to Springfield MCFP, Redding underwent thoracic decompression discectomy surgery. Redding continues to receive health care in connection with his back issues at the Springfield facility.

Other than as discussed above, Redding offers no evidence to contradict or rebut any of the evidence offered by the defendants. Although Redding offers argument expressing his belief that some of defendants' evidence is not credible, he provides no grounds for concluding that either Dhaliwal or Davis was responsible for identifying and recruiting a willing and qualified neurosurgeon to perform the surgery Redding believed he required, or that either of those

defendants deliberately interfered with Sheridan's efforts to do so. In the absence of such evidence, no grounds exist to support the conclusion that the deprivation of Redding's Eighth Amendment rights, if any occurred, was caused by the conduct of either Dhaliwal or Davis.

Moreover, I agree with the defendants that the evidentiary record contains no support for the proposition that the delay in Redding's surgery was unreasonable under the circumstances. During the period preceding the December 2010 approval of the surgery, there was no consensus among Redding's treating and consulting physicians either that the surgery was necessary or that Redding was a good candidate for the surgery until shortly before approval issued. Even after approval issued, once Buza withdrew from providing further treatment to Redding, Redding's remaining and/or new treating and consulting physicians again displayed disagreement as to whether surgery was the best approach to treating Redding's symptoms, and ultimately he underwent a different surgical procedure than the one initially approved at Sheridan, further indicating that there was room for reasonable difference of opinion as to the advisability of lumbar spinal surgery in Redding's case. In light of the medical judgment of several of Redding's care providers that the requested surgery was not necessary to treat Redding' condition and the absence of any clear consensus that the lumbar spinal surgery procedure was reasonably necessary, Redding cannot establish that delay in providing the procedure constituted an actionable deprivation of his Eighth Amendment rights.

For the foregoing reasons, defendants Dhaliwal and Davis are entitled to summary judgment of Redding's Eighth Amendment claim.

**II. Redding's First Amendment Claim**

Redding's claim premised on the violation of his rights under the First Amendment arises

out of defendants Dhaliwal's, Tovar's, and Jacquez' actions, set forth above, taken in alleged retaliation for Redding's exercise of his First Amendment rights and with the intent to chill Redding's further exercise of those rights. The Ninth Circuit has opined that:

> Of fundamental import to prisoners are their First Amendment rights to file prison grievances. . . and to "pursue civil rights litigation in the courts. Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield.

*Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005) (citations, internal quotation marks and modifications, and footnotes omitted). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567-568 (footnote omitted), *citing Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000), *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994).

**A. Dhaliwal's Reduction of Redding's Pain Medications**

As noted above, in September 2009 Redding filed a formal and an informal grievance regarding Sheridan medical staff's failure to increase his narcotic pain medications, and on October 16, 2009, defendant Dhaliwal ordered that Redding begin to taper off his narcotic consumption. It is Redding's position that Dhaliwal did so for the purpose of retaliating against Redding for filing his grievances of the previous month and to prevent him from filing further such grievances. Also as noted above, defendants offer Dhaliwal's testimony that at the time he

ordered Redding's medications reduced, he was unaware of Redding's grievances, and that he ordered the reduction based on his medical judgment that Redding would be better served by prescription of non-narcotic pain medication, and a regimen of exercise and weight loss. In opposition to defendants' evidence, Redding offers no evidence of his own but rather argument that Dhaliwal must necessarily have known about his grievances and that Dhaliwal's expressions of concern regarding the long-term effects of reliance on narcotics are disingenuous.

In the absence of evidence to contradict or rebut defendants' offerings, a trier of fact could not reasonably conclude that Dhaliwal's decision to taper Redding off narcotics was motivated by any retaliatory animus. In addition, in light of Dhaliwal's unrebutted testimony regarding his medical judgment that Redding would be a better candidate for surgery if he became narcotic-free – a judgment shared by several of the medical care providers with whom Redding subsequently consulted – I find that the proximity in time between Redding's grievances and Dhaliwal's medical decision does not create any material question of fact regarding Dhaliwal's motivation. Consequently, defendant Dhaliwal is entitled to summary judgment of Redding's First Amendment claim to the extent premised on the October 2009 reduction in Redding's pain medications.

**B. Redding's Placement in Administrative Detention**

As noted above, between October 2009 and September 2010, Redding filed a number of grievances in connection with efforts by Sheridan's medical staff to reduce Redding's reliance on a wheelchair for "long distance" locomotion. Also as noted above, in August 2010 Redding was ordered placed in the SHU for administrative detention. Redding takes the position that he was ordered placed in the SHU by defendant Tovar, in retaliation for his filed grievances. Defendants

offer Tovar's testimony that as of August 27, 2010, the date Redding was ordered placed in the SHU, she had been working at Sheridan for only one week, and that she had absolutely no knowledge of and grievances he might have filed. Tovar further testifies that she lacked authority to order an inmate placed in administrative detention, and offers documentary evidence that the order was actually issued by a Lt. Reed, not a party to this action.

In opposition to defendants' motion, Redding argues that although Tovar may have lacked authority to issue the order placing him in the SHU, she was nevertheless capable of requesting that the order issue. I agree with this argument, and find that the documentary evidence that the administrative detention order was signed by Reed is not sufficient to mandate disposition of Redding's claim in defendants' favor. However, Redding offers no evidence that Tovar was subjectively aware of any of his grievances, none of which were filed between August 20, 2010, when Tovar was first assigned to Sheridan, and August 27, 2010, when Redding was placed in the SHU. In the absence of any evidence to contradict or rebut Tovar's testimony, a trier of fact could not reasonably conclude that Tovar harbored any retaliatory animus toward Redding at the time he was placed on administrative detention. Defendant Tovar is therefore entitled to summary judgment of Redding's First Amendment claim to the extent premised on his placement in the SHU in August 2010.

**C. Redding's Grievance Regarding Failure to Implement his Special Diet**

As noted above, in January 2010 Dhaliwal ordered that Redding be provided a diet without tomato or citrus products, the Sheridan mess hall initially refused to comply with the order, and in February 2010 Redding grieved its failure to do so. The same day that Redding filed his grievance, Sheridan Case Counselor Simmons responded to it by advising Redding that

standard procedures for requesting a special diet required that defendant Davis, then Clinical Director at Sheridan, approve the diet, following which the request would be forwarded to defendant Jacquez, Sheridan's Associate Warden, for final authorization. Redding takes the position that Jacquez failed to respond to the grievance, and did so for the purpose of retaliating against him for grieving the issue in the first place. Defendants offer Simmons' sworn declaration that he did not consult with Jacquez regarding Redding's informal grievance of February 8, 2010, as well as Jacquez' sworn declaration that he was unaware of the grievance, was never at any material time aware of the special diet request, and that he took no action to chill Redding's First Amendment rights.

In opposition to defendants' motion, Redding offers no evidence either that his grievance of February 2010 was forwarded to Jacquez for further processing, that Simmons' response to the grievance was less than complete, or indeed that Redding obtained Davis' approval of the special diet or otherwise formally requested that Jacquez provide ultimate authorization thereof. In the absence of evidence on any of these points, a trier of fact could not reasonably conclude that Jacquez failed either to further process Redding's grievance or to authorize Redding's special diet for retaliatory purposes. In consequence, defendant Jacquez is entitled to summary judgment of Redding's First Amendment claim to the extent premised on the purported failure to process his grievance of February 2010.

## CONCLUSION

For the reasons set forth above, defendants' motion (#220) should be granted, and summary judgment should issue in defendants' favor on each of Redding's remaining claims, and a final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

Dated this 10th day of September, 2013.

Honorable Paul Papak
United States Magistrate Judge